American Zinc, Lead and Smelting Company, a corporation v. Commissioner.
American Zinc Lead & Smelting Co. v. Commissioner
Docket No. 109991.
United States Tax Court
1943 Tax Ct. Memo LEXIS 284; 2 T.C.M. (CCH) 160; T.C.M. (RIA) 43249; May 26, 1943
*284 Upon the facts, held that the amount of the purchase price paid by petitioner for real estate transferred at its direction to its wholly-owned subsidiary constituted a loan to the subsidiary, not a contribution to capital, and therefore petitioner was not prohibited by section 112 (b) (6) of the Internal Revenue Code from taking a bad debt deduction for the loss which it sustained on the loan when its subsidiary dissolved. C. Powell Fordyce, Esq., 506 Olive St., St. Louis, Mo., for the petitioner. Angus R. Shannon, Jr., Esq., for the respondent. TYSON Memorandum Findings of Fact and Opinion Respondent determined a deficiency in income tax for the calendar year 1939 against petitioner in the sum of $10,236.40. Petitioner assigned the following errors as to this determination: (1) the disallowance of $53,737.03 deducted as a bad debt owed to petitioner by its wholly-owned subsidiary, Appalachian Limestone Company; (2) the disallowance of a deduction of $1 as a loss on stock owned by petitioner in Appalachian Limestone Company. On brief, petitioner states that he is willing to concede that respondent properly disallowed the $1 deduction in the event we hold that the cost basis *285 to it of the Appalachian Limestone Company stock was only $1. The proceeding has been submitted upon the pleadings, testimony, and a stipulation of facts. The stipulated facts not set forth in our findings of fact are included therein by reference. Findings of Fact Petitioner is a corporation organized on January 26, 1899 under the laws of Maine. Its principal office is in St. Louis, Missouri. It filed its income and excess-profits tax return for the calendar year 1939 with the Collector of Internal Revenue, First Missouri District, St. Louis, Missouri. Petitioner holds stocks of several operating subsidiary corporations and manages and acts as fiscal agent for these subsidiaries. Pursuant to a contract dated May 7, 1929, petitioner purchased from the American Agricultural Chemical Company (hereinafter referred to as Chemical) all of the outstanding capital stock of G. C. Buquo Line Company, a North Carolina corporation, (hereinafter referred to as Buquo), for the sum of $1. This sum was duly paid by petitioner upon the delivery of such stock consisting of 161 shares of common stock having a par value of $100 a share. At that time Buquo had few tangible assets, it having conveyed *286 substantially all its assets to Chemical so that Chemical could include them in a blanket mortgage conveying Chemical's properties. Under the contract the few tangible assets which were owned by Buquo were to be transferred to Chemical and the liabilities of Buquo were to be assumed by Chemical. Pursuant to the same contract, Chemical conveyed to Buquo, as petitioner's nominee, five parcels of real estate, including a limestone quarry, for the sum of $100,000. At the time of the conveyance $25,000 of the purchase price was paid to Chemical by petitioner in cash and the balance was evidenced by three promissory notes, each for the sum of $25,000, dated June 3, 1929, due in one, two, and three years, respectively, and bearing interest from date until paid at the rate of 6 per cent. At the time of the foregoing conveyance neither petitioner nor any of its subsidiaries, except Buquo, was licensed to do business in North Carolina. Petitioner acquired the stock in Buquo so that the real estate purchased from Chemical could be conveyed to a company which had a license to do business in North Carolina. The contract dated May 7, 1929 was authorized by petitioner's board of directors in *287 minutes dated May 21, 1929. Nowhere in petitioner's minutes is there any reference to any agreement between petitioner and Buquo as to the manner in which Buquo was to pay for the assets conveyed to it. There was no contract of sale between petitioner and Buquo concerning the property, nor was a mortgage taken. It was intended that Buquo should operate the property. On its books petitioner carried its investment in the capital stock of Buquo at $1 in a separate investment account. No entries were made by petitioner in this account after the purchase of the Buquo stock until July, 1939, when this stock investment was charged off the books of petitioner because of its alleged worthlessness. Upon the conveyance of the real estate to Buquo, petitioner set up on its books the amount of $100,000 which it had obligated itself to pay for the real estate as an open account receivable from Buquo. This account was kept separate from the investment account mentioned in the foregoing paragraph. Buquo on its books carried the account as an open account payable to petitioner. Likewise, Buquo on its balance sheet and in its Federal income tax returns consistently showed the account as an open account *288 payable. Petitioner's open account with Buquo was charged with amounts equivalent to the interest which petitioner paid on the notes which it gave to Chemical in part payment of the real estate, but no interest was charged by petitioner on the account after the notes to Chemical had been paid in 1932. From time to time credits to the open account receivable were made by petitioner for cash transferred to it by Buquo. On June 30, 1939, as a result of these credits the books of petitioner and Buquo showed that there was due to petitioner from Buquo the sum of $95,883.92. Petitioner's subsidiaries do not borrow money from outsiders but all their borrowings are from petitioner. Petitioner customarily does not charge interest on open accounts to any of its subsidiaries. Petitioner and Buquo intended the sums reflected in the open accounts set up in connection with the transfer of the real estate from Chemical to Buquo to constitute a debt owed to petitioner by Buquo and not a contribution to capital. Chemical expected this debt to be repaid. In 1935 Buquo changed its name to Appalachian Limestone Company (hereinafter referred to as Appalachian). The balance sheet of Appalachian as of *289 May 31, 1939 showed current assets of $1,765.11, other investments and advances of $10.24, and a property account less reserves for depreciation of $39,359.10, the total book value of all the assets being $41,134.45. It also showed under the heading, Liabilities: accounts payable to petitioner of $95,872.92, accounts payable to others of $151.36, taxes accrued of $196.46, capital stock of $16,100, special deficit on June 3, 1929 of $16,100, a deficit in the surplus account of $44,586.29, and a reserve for depreciation and depletion of $10,500. During the calendar years 1935 through 1938 and for the first six months of 1939 Buquo, known as Appalachian after 1935, sustained net losses which it disclosed on its Federal income tax returns in the following respective amounts: $427.75, $194, $853, $933.23, $488.30. In January 1939 the local taxing officials in North Carolina assessed all tangible property of Appalachian for local taxing purposes at a value of $32,782. Pursuant to recommendations voted on May 9, 1939 by petitioner's board of directors American Limestone Company (hereinafter referred to as American), another wholly-owned subsidiary of petitioner, purchased in June, 1939 *290 all of the assets of Appalachian except the amount of $1,833.95 in money. This purchase was made through an offer of American and acceptance thereof by resolution of the stockholders of Appalachian which resolution provided, inter alia, that the proceeds of the sale be distributed to those "entitled thereto" and that Appalachian be dissolved. Appalachian was subsequently duly dissolved. Petitioner's directors recommended this purchase because they believed that the two limestone quarries in North Carolina, one of which had belonged to Appalachian and one to American could be operated more economically and simply if both were owned and operated by one company; because petitioner's directors considered it undesirable and dangerous for American to continue to conduct business in North Carolina without a license as it had done in the past; and because petitioner's directors desired American to continue selling in North Carolina limestone produced by the latter company from its properties in Tennessee, as it had done in the past. On June 30, 1939 American was licensed to do business in North Carolina. The purchase price paid by American to Appalachian in connection with this sale was *291 $40,312.94. On the books of Appalachian this amount represented the depreciated value of the assets purchased by American from Appalachian. In June 1939, the assets so purchased did not have a fair market value in excess of $40,000. The purchase price plus additional cash of $1,833.95 owned by Appalachian or an aggregate amount of $42,146.89 which represented all money or property then owned by Appalachian, was paid in June, 1939 by Appalachian to petitioner. Petitioner and Appalachian then recorded the payment of $42,146.89 in their respective open accounts with each other. After this entry was made, petitioner's open account with Appalachian showed a balance due petitioner by Appalachian of $53,737.03. In July 1939, petitioner made entries in its books charging off as uncollectible the open account receivable of Appalachian in the sum of $53,737.03. This amount has never been repaid to petitioner. At no time did petitioner or Appalachian cause any entries to be made on their respective books showing that Appalachian had paid or credited anything to petitioner in cancellation or redemption of the stock in Appalachian owned by petitioner; and petitioner never received anything in *292 cancellation or redemption of its stock in Appalachian as a result of the dissolution of Appalachian. On petitioner's Federal income and excess profits tax return filed for the calendar year 1939, petitioner claimed as a deduction the amount of $53,737.03 representing the alleged bad debt and the amount of $1 representing the amount paid by petitioner for the stock of Buquo as a loss allegedly sustained during the taxable year due to the worthlessness of that stock. Respondent disallowed each such deduction. Opinion TYSON, Judge: The sole issue is whether petitioner is entitled to a bad debt deduction for the taxable year 1939 of $53,737.03 representing the amount advanced to its wholly-owned subsidiary over and above what it received in return from the subsidiary on liquidation. Petitioner contends that the advances made were loans. Respondent contends that they were contributions to capital and therefore the amount received by petitioner in 1939 when the subsidiary was liquidated constituted a distribution in liquidation within the meaning of section 112 (b) (6) of the Internal Revenue Code so that petitioner was not entitled to a loss deduction on the transfer. [1]
*293 The core of the question as indicated by the contentions of the parties, is whether the payments made by petitioner to the seller of real property which property was transferred to petitioner's subsidiary-nominee constituted loans by petitioner to the subsidiary or contributions to capital. This is a question of the intent of the parties. The Edward Katzinger Co., 44 B.T.A. 533 and authorities cited therein, affirmed 129 F.2d 74. We are of the opinion that the payments made were loans, and so intended to be by the parties and not contributions to capital. Petitioner when the conveyance of real property was made to its subsidiary set up an open account receivable showing $100,000 due from Buquo. Buquo also set up an open account payable to petitioner of that amount on its books. Buquo on its balance sheet and its Federal income tax returns consistently showed this account as an account payable. Petitioner made credits to the account from time to time as cash was transferred to it by Buquo so that on June 30, 1939 the books of petitioner and Buquo showed the sum of $95,883.02 to be due petitioner. Furthermore, there was *294 uncontroverted testimony by petitioner's secretary-treasurer that petitioner acts as fiscal agent and manages the affairs of its subsidiaries, that it was the usual practice of petitioner to finance its subsidiaries by means of loans similar to this one and that the open accounts set up by petitioner and Buquo in this instance were intended by petitioner to be a loan and not a contribution to capital. In view of this evidence and from the whole record, we hold that the payments made by petitioner for the property transferred to Buquo were loans. The Edward Katzinger Co., supra;H. G. Hill Stores Incorporated, 44 B.T.A. 1182; Cf. Glenmore Distilleries Co., 47 B.T.A. 213. Respondent points to the following facts as indicating that the payments were in fact contributions to capital; that Buquo had no assets at the time petitioner acquired all its capital stock and acquired none other than the real estate which petitioner caused to be conveyed to it by Chemical; there was no contract of sale between petitioner and Buquo; a mortgage was not executed; that there was no understanding as to how the *295 loan was to be repaid; and that no interest was charged by petitioner for the loan. It is perfectly consistent that a loan could exist even with those factors present. We have weighed these facts along with the other evidence and have concluded that they do not overcome the force of the evidence showing that the payments by petitioner constituted a loan and an indebtedness to petitioner. Cf. The Edward Katzinger Co., supra. In view of our holding that the subsidiary was indebted to petitioner, it follows that the distribution in 1939 to petitioner was in part payment of the indebtedness. Thereafter nothing was left to distribute to petitioner as stockholder. Thus section 112 (b) (6), supra does not apply. H. G. Hill Stores, Incorporated, supra;Glenmore Distilleries Co., supra. We held that the balance of $53,737.03 due petitioner from Appalachian became worthless in the taxable year 1939 upon sale of all Appalachian's property and payment of the proceeds thereof to petitioner and that petitioner is entitled to that amount as a bad debt deduction for that year. [2]
*296 There is yet another ground for our conclusion that section 112 (b) (6) is not applicable to the distribution in question. That section does not apply to a receipt by a corporation entirely of money in complete liquidation of a wholly owned subsidiary. Stimson Mill Co., 46 B.T.A. 141. Thus even assuming that the payments or advances made by petitioner were contributions to the capital stock of Appalachian and assuming further that the payment of $42,146.89 cash by Appalachian to petitioner constituted a distribution by Appalachian to petitioner as a stockholder, 112 (b) (6), would not be applicable. In respect of the issue relative to the deduction of $1 as a loss on stock owned by petitioner in the subsidiary, we hold that the cost basis to it of such stock was $1 since that was the amount which it actually paid therefor in 1929. In view of this holding petitioner has conceded that respondent properly disallowed the $1 loss deduction. Effect will be given to this concession. Decision will be entered under Rule 50. Footnotes
1. Section 112. Recognition of Gain or Loss. * * * * *
(b) Exchanges Solely in Kind. - * * * * *
(6) Property Received by Corporation on Complete Liquidation of Another. - No gain or loss shall be recognized upon the receipt by a corporation of property distributed in complete liquidation of another corporation. * * *↩
2. Section 23(k) of the Internal Revenue Code↩, as amended by section 124 of the Revenue Act of 1942, which section as amended is applicable to the taxable year, provided in part that there shall be allowed as deductions "Debts which become worthless within the taxable year."